DAILEY v. WESTERN N. Y. & P. RY. CO.

(Supreme Court, Appellate Division, Fourth Department.   July 24, 1900.)

RAILROADS—DIVERSION OF WATER—SPILLWAY—CONSTRUCTION—LIABILITY.

After a state canal had been abandoned, the superintendent of public
works authorized adjoining landowners to cut through one bank of it and
close up a culvert under it, and thereby allow the water of a creek to be
carried through the prism of the canal and prevent it from overflowing
their lands.   Afterwards a railroad company purchased the canal from
the state, and built a track along its bank, and, to prevent washouts in
high water, constructed a spillway, so the water could flow out of the
canal when it reached a certain height, which caused it to overflow the
plaintiff's lands in rainy seasons.   *Held*, that the railroad company was
not liable to plaintiff for the damage so occasioned, since plaintiff had
only a license to turn the water into the canal, and defendant had not in-
vaded any of her legal rights.

Laughlin, J., dissenting.

Appeal from special term, Livingston county.

Action by Cornelia Dailey against the Western New York & Penn-
sylvania Railway Company.   From a judgment in favor of plaintiff,
defendant appeals.   Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WIL-
LIAMS, and LAUGHLIN, JJ.

Charles J. Bissell, for appellant.
James S. Thompson, for respondent.

WILLIAMS, J.   The action was brought to restrain the continu-
ance of, and to compel the defendant to close up, a spillway for wa-
ter, through the embankment upon which its tracks were laid, per-
mitting water to flow upon and over the plaintiff's lands.   Most of the
facts are undisputed, and are briefly as follows:   In the year 1840
the state of New York constructed the Genesee Valley Canal from
the village of Mt. Morris, through the counties of Cattaraugus, Alle-
ghany, Livingston, and Monroe, to the city of Rochester.   In Living-
ston county the canal ran through the town of Leicester, and the
plaintiff's farm of 35 acres was situated just east of the line of this
canal.   The direction of the canal at this point was north and south;
and across the canal, from west to east, ran three creeks,—Samp's
creek, the most southerly one;   White's creek, next northerly;   and
Beard's creek, still further north.   At the time the canal was con-
structed, Samp's creek had two branches, and these were brought
together by the state westerly of the canal, and taken to and under
the canal, in a single channel, by means of a culvert, and thence into
a ditch constructed by the state along, parallel to, and easterly of
the canal, north to the place where White's creek was also taken
under the canal and brought into this State ditch.   From this place
the State ditch was continued northeasterly through the plaintiff's
lands, then belonging to one Jones, and the lands of one Whitmore,
into Beard's creek; some distance easterly of the point where it
(Beard's creek) passed under the canal, which was carried over
the creek by means of an aqueduct.   Beard's creek, some distance to
the east of the canal, emptied into the Genesee river.   Before the

canal was constructed the lands owned by the plaintiff and Jones, to the east, were mostly swampy, grown up to black-ash timber, and were overflowed by the two branches of Samp's creek. The canal was operated from the time of its construction in 1840 until 1878, and during all these years the plaintiff's lands to the east of the canal were relieved from the flow of the waters of the two branches of Samp's creek, which were gathered and conducted into the State ditch, and thence into Beard's creek, and were arable land and fit for cultivation. In 1868 the State ditch had become considerably filled up, and the waters from Samp's creek had frequently broken over the banks and flooded the adjoining lands, and the state during that year cleaned out the ditch and Beard's creek from the canal down to the Genesee river. In 1877 the legislature, by chapter 404 of the Laws of that year, provided for the abandonment of this canal and authorized its sale, and the same was abandoned in 1878. The culvert under the canal and the State ditch were obstructed and filled up, so that the waters from Samp's creek flooded the adjoining lands, both east and west of the canal, and the property owners complained to the state that they were suffering injury therefrom. Thereafter and in 1880 the superintendent of public works authorized and directed the landowners to, and they did, cut a ditch through the west bank of the canal, and close up the culvert under the canal, and thus turn the waters of Samp's creek into the prism of the canal. The superintendent also authorized and directed the removal of the aqueduct carrying the canal over Beard's creek, which was done, and by these changes the waters of Samp's creek thereafter flowed northerly along the canal prism and into Beard's creek; and the low lands to the east of the canal were thus relieved from the overflow of the water from Samp's creek, except so far as they may have reached such lands by the overflow of Beard's creek. This condition of things continued until the construction of the spillway complained of in this case, and hereinafter referred to. In 1880 the legislature passed an act (chapter 326 of the Laws of that year) providing specifically for the sale of the canal; and in November, 1881, under said act, the canal was sold and conveyed to the Genesee Valley Canal Railroad Company, and in December of the same year the same was conveyed by said railroad company to the Western New York & Pennsylvania Railroad Company. The latter company at once went into possession of the same, and constructed its railroad upon and along the easterly bank of the abandoned canal, and operated the same until in 1895 the defendant, by the foreclosure of a series of mortgages, acquired title to the property. After the construction of the railroad, for several years, when the waters in the creeks became high, the waters of Samp's creek, flowing northerly along the canal prism, would meet the waters of Beard's creek, which backed up into the canal prism, and the adjacent lands east and west of the canal would be overflowed; and the easterly canal bank would be so affected by the water as to render the tracks of the railroad lying along the same unsafe for the operation of the trains thereon. From 1880 down, the State ditch had been substantially filled up with brush and sediment, and there was no way to carry off the waters

of Samp's creek, except through the canal prism, without flooding
the lands on the east side of the canal. In 1887 or 1888 the railroad
company then owning and operating the railroad, in order to relieve
the condition of things existing, and which rendered the operation of
the railroad dangerous in seasons of high water and flood, cut out
the easterly bank of the canal, along which the tracks were laid,
at the place where White's creek passed under the canal and into
the State ditch, and constructed the spillway in question, 36 feet
wide, the top thereof being 2.86 feet above the bottom of the canal
prism. Over this the railroad tracks were carried along the canal
bank. This spillway has existed in substantially the same shape since
it was so constructed, and this action was not brought to get rid
of the same until in November, 1895. When the waters of Beard's
creek were not high enough to set back into the canal prism, all the
waters from Samp's creek ran along the canal prism, and directly
into Beard's creek, and not over the spillway. Before the commence-
ment of this action, however, Beard's creek, at a point 20 to 30 feet
east of the canal, had become filled up with brush, sediment, and
trees growing in the channel, the channel not having been cleaned
out since 1868; and in times of flood and high water these obstruc-
tions set the water back into the canal, and they flowed southerly,
meeting and setting back the waters from Samp's creek, and both
went over the spillway upon the lands to the east of the canal. The
evidence given leaves it very doubtful if the plaintiff's lands were
overflowed to any greater extent in times of high water, with the
spillway in the canal bank, than they would have been if the spill-
way had not been constructed. The water from Samp's creek had
to go easterly from the canal into Beard's creek, and thence into
the Genesee river. It would go directly from the canal prism into
Beard's creek, except in times of high water and floods. When floods
came, Beard's creek could not carry its own water alone without
overflowing, by reason of the obstructions therein. Whether, then,
the water from Samp's creek was attempted to be thrown into Beard's
creek directly from the canal prism, or was allowed to go through
the canal bank at White's creek by means of the spillway, and thus
find its way to Beard's creek along the line of the old State ditch
and White's creek, could, it seems to us, make little difference to
the plaintiff or her lands. In either case the same quantity of water
would be thrown upon the plaintiff's lands, especially in view of
the obstructions in Beard's creek east of the canal, and the damage
to the plaintiff would be no greater in the one case than in the other,
so far as we can see from the evidence given on the trial.

The trial court, in the fourteenth finding of fact, stated that the
railroad company, which built the railroad and constructed the spill-
way, by means of ditches had collected large quantities of water
from a large territory west of the canal, which formerly flowed under
the canal (Samp's creek), and caused it to flow through said canal
and through said spillway upon the plaintiff's land, and had by means
of said ditches gathered a portion of the water of Beard's creek, and
caused it to flow through the prism of said canal and through the
spillway upon the plaintiff's lands. This is very general language,

and is a statement of conclusion, rather than of facts. The railroad company did construct the spillway, but it was not responsible for any ditches to the west of the canal that collected any of the waters of Samp's creek or Beard's creek, and threw those waters into the canal prism. The landowners and officials claiming to represent the state turned the waters of Samp's creek into the prism of the canal in 1880, while the state still owned the canal, and before any of the railroad companies acquired title to the canal banks or prism. The railroad companies were none of them responsible for the obstruction of the culvert which took the waters of Samp's creek under the canal, nor for the filling up of the old State ditch, or the obstructions in or filling up of the channel of Beard's creek, just east of the canal, nor for the destruction of the culvert at Samp's creek, and the aqueduct at Beard's creek, nor for the cutting of the ditch through the west bank of the canal at Samp's creek, letting the waters of that creek into the canal prism, and allowing them to flow northerly along the canal to and into Beard's creek at the aqueduct. When the railroad company took title to the canal property, and built its railroad thereon, it found all the ditches and channels constructed which conducted the waters in question into the canal and Beard's creek. It found a condition of things, at times of high water, in which the lands of the plaintiff were flooded with the waters in question to fully as great an extent as they have been flooded since the construction of the spillway; and this finding can only be supported upon the one theory that the railroad company, by the simple act of constructing the spillway, accomplished the results stated in the finding of fact in question. It may well be doubted whether, under the acts of the legislature providing for the sale of the canal property, and in view of the provisions thereof, the property owners and the state officials had any authority to turn the waters of these two creeks into the prism of the canal; whether the railroad company might not regard their acts as unauthorized, or at least as a mere license by the state to so dispose of the waters of these creeks. If the turning of the waters of Samp's creek into the canal was by a mere license, then the railroad company might revoke the license and turn the waters from the canal into the old State ditch again. In that event, how could the plaintiff complain that such waters were turned from the canal into the State ditch at White's creek rather than at Samp's creek? or that, instead of turning the whole waters of Samp's creek back into the State ditch, the railroad company only turned such waters as in times of flood and high water would run over the spillway, leaving all other waters to flow directly into Beard's creek, thus relieving the plaintiff's lands from the same? The plaintiff seems to proceed upon the theory (and the decision is based upon the same proposition) that the plaintiff had the legal right to have the water run as it did after it was turned into the canal prism under the direction of the state officials in 1880, and that any interference with such right by the railroad company was unlawful. We are unable to see how any such right existed, in view of the provisions of the legislative acts hereinbefore referred to. No such right was ever acquired by the plaintiff by grant or prescription, and the railroad

company took title to the property under the acts of the legislature subject to no such right, and was not bound to submit to the burden thus sought to be imposed upon it. White v. Sheldon, 35 Hun, 193; Wiseman v. Lucksinger, 84 N. Y. 31.

It seems to us, upon a full examination of the record, that the decision of the trial court was erroneous, and that the judgment appealed from should be reversed, and a new trial granted, with costs to abide event. So ordered. All concur, except LAUGHLIN, J., who dissents.